**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| F-Squared Investment Management, LLC, *et al.*, | Case No. 15-11469 (LSS) |
| Debtors. | |
| Craig Jalbert, in his capacity as Trustee for<br>F2 Liquidating Trust, | |
| vs. | |
| Agnes Carol McClelland, | Adv. Proc. No. 17-50718 (LSS) |
| Ann Aghababian, | Adv. Proc. No. 17-50719 (LSS) |
| Charles Hart, | Adv. Proc. No. 17-50722 (LSS) |
| Geordie McClelland, | Adv. Proc. No. 17-50755 (LSS) |
| George McClelland, | Adv. Proc. No. 17-50758 (LSS) |
| Graham Hart, | Adv. Proc. No. 17-50767 (LSS) |
| Hazel McClelland, | Adv. Proc. No. 17-50772 (LSS) |
| Jacquelyn McClelland, | Adv. Proc. No. 17-50786 (LSS) |
| Lindsay Hart, | Adv. Proc. No. 17-50849 (LSS) |
| Lindsay McClelland, | Adv. Proc. No. 17-50850 (LSS) |
| McClelland Irrevocable Grantor Trust, | Adv. Proc. No. 17-50854 (LSS) |
| Quinn McClelland Hart, | Adv. Proc. No. 17-50859 (LSS) |

**OPINION**

Before me are motions for partial summary judgment ("Motions") in twelve

adversary proceedings filed by the trustee of the F2 Liquidating Trust ("Trustee" or

"Plaintiff") seeking to avoid as fraudulent conveyances certain transfers made prepetition by

F-Squared Management, LLC to each Defendant. These transfers were periodic payments

made by F-Squared[1] so that each Defendant could pay his or her income taxes on revenue

---

[1] "F-Squared" refers to F-Squared Management, LLC and its predecessor entities. *See infra* Section
II.A (describing history of F-Squared's corporate form).

generated by F-Squared ("Tax Distributions"). Defendants contend that there are no facts in dispute and that the Tax Distributions were for reasonably equivalent value.

Trustee submits no evidence in opposition and does not otherwise assert a colorable basis for a genuine dispute of material fact, leaving the issue ripe for summary judgment. On the undisputed record before me, I find that the Tax Distributions were for reasonably equivalent value because the Tax Distributions were a bargained-for exchange in connection with a shareholder-approved conversion of F-Squared from a corporate form to an LLC. The Motions are granted.

## I.    PROCEDURAL HISTORY

F-Squared Management, LLC and certain affiliates[2] filed voluntary chapter 11 petitions on July 8, 2015.[3] Pursuant to Debtors' Joint Plan of Liquidation, Plaintiff Craig Jalbert was appointed trustee for the F2 Liquidating Trust effective January 22, 2016.

On July 17, 2017, Trustee filed separate complaints (each, a "Complaint" and collectively "Complaints")[4] against Defendants seeking recovery of various alleged fraudulent transfers and/or preferential transfers. In an exhibit attached to each Complaint,

---

[2] The debtors in these cases are: F-Squared Investment Management, LLC, F-Squared Investments, Inc., F-Squared Retirement Solutions, LLC, F-Squared Alternative Investments, LLC, F-Squared Solutions, LLC, F-Squared Institutional Advisors, LLC, F-Squared Capital, LLC, AlphaSector LLS GP 1, LLC, and Active Index Solutions, LLC.

[3] Chapter 11 Voluntary Petition, D.I. 1. The docket of the Chapter 11 cases, captioned *F-Squared Investment Management, LLC*, Case No. 15-11469 (LSS) (Bankr. D. Del.), is cited herein as "D.I. __". The dockets of adversary proceedings are cited herein as "A.P. __". Except where otherwise noted, this opinion will reference the docket of *Craig Jalbert v. George McClelland*, Adv. Pro. 17-50758 for documents relating to the adversary proceedings.

[4] *E.g.*, Compl. to Avoid and Recover Transfers, Ex. A (Statement of Payments Issued), *Craig Jalbert v. George McClelland*, Adv. Pro. 17-50758, A.P. 1-1. The complaints are materially identical with respect to the Tax Distributions, excepting one additional Tax Distribution (totaling seven) made to George McClelland on October 30, 2014. *Compare id. with* Compl. to Avoid and Recover Transfers, Ex. A (Statement of Payments Issued), *Craig Jalbert v. Agnes Carol McClelland*, Adv. Pro. 17-50718, A.P. 1-1.

2

Trustee identifies each transfer by Transferring Debtor, Date Paid, Check Number, and Amount. In this matrix, Trustee categorizes the types of transfers as: Bonus, 401K Match, Tax Distribution, Profit Distribution or Units Repurchase.

I previously granted a motion to dismiss these adversary proceedings for failure to adequately plead insolvency.[5] In response, Trustee filed his Motion for Leave to File an Amended Complaint that I will rule on separately.[6]

The subject of these Motions is the Tax Distributions, which are periodic payments that F-Squared made to Defendants in 2013 and 2014 so that each Defendant could pay income taxes on F-Squared's revenue. These Motions do not seek summary judgment with respect to Profit Distributions, which are categorized separately on the Exhibit A matrices and are, under the LLC Operating Agreement (defined below), not a distribution targeted for tax payments.

Defendants moved for partial summary judgment[7] and the Motions have been fully briefed.[8] I heard oral argument on February 18, 2021[9] and the matter is ripe for decision.

---

[5] *In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019).

[6] A.P. 75.

[7] Defs.' Mot. for Partial Summ. J., A.P. 57.

[8] Mem. in Supp. of Mot. for Partial Summ. J. by Defs. ("Opening Brief"), A.P. 58; Trustee's Opp'n to Defs.' Mot. for Partial Summ. J. ("Answering Brief"), D.I. 78; Defs.' Reply in Supp. of Mot. for Partial Summ. J. ("Reply Brief"), A.P. 80.

[9] Feb. 18 Hr'g Tr. ("Transcript"), A.P. 101.

## II.    STATEMENT OF FACTS

### A. F-Squared Corporate Structure

The genesis of the Tax Distributions lies in F-Squared's shifting corporate structure. On May 4, 2006, Howard Present, Vadim Fishman and George McClelland formed F-Squared as a Delaware limited liability corporation (an "LLC") under the name of F-Squared Investments, LLC.[10]  On June 30, 2008, F-Squared converted to an Internal Revenue Service Schedule C corporation (a "C-Corp"), under the name F-Squared Investments, Inc.[11]  McClelland was an initial investor in F-Squared, and served as a board member and in various executive roles at F-Squared until resigning from the board in June of 2014.[12]

F-Squared was unprofitable at first, but profitability appeared imminent around late 2009, at which point the company's owners, accountants and lawyers decided to assess the potential tax advantages of converting F-Squared back to an LLC.[13]  After consulting with its professionals, McClelland became convinced that converting F-Squared back to an LLC would be advantageous.[14]  He also understood that, from the current shareholders' perspective, a potential downside of such a structure was that the tax liability arising from F-Squared's profits would be "passed through" to the shareholders qua members of the converted LLC, regardless of whether F-Squared actually disbursed those profits.[15]

---

[10] Decl. of George McClelland in Supp. of Mot. For Partial Summ. J. ("McClelland Declaration" or "McClelland Decl.") ¶ 12, A.P. 59.

[11] *Id.* ¶ 13.

[12] *Id.* ¶¶ 9–10.

[13] *Id.* ¶¶ 14–15.

[14] *Id.* ¶ 16.

[15] *Id.* ¶ 17.

The LLC conversion required shareholder approval, so McClelland, at Present's direction, set about convincing the shareholders of the conversion's benefits.[16]  Some shareholders expressed fears about the risk that F-Squared would not disburse the cash needed to pay the passed-through tax liability.[17]  To assuage these fears, McClelland sought assurances from F-Squared that, if the shareholders voted to approve the conversion, F-Squared would distribute the funds necessary for each shareholder to pay any passed-through tax liability.[18]  In a letter dated June 16, 2010, Present and McClelland communicated to the shareholders that "there likely will be a tax liability 'passed through' to all investors based on their pro rata share of the LLC holding company's profitability," and that "[t]o offset this, the LLC holding company currently intends to make cash distributions to all investors equal to the maximum federal tax rate plus an amount equivalent to most state tax rates, applied to the federal taxable income allocated to them by the LLC holding company."[19]  F-Squared management told investors that the agreement forming the LLC would reflect this arrangement.[20]

The shareholders ultimately approved the conversion, and on June 28, 2010 F-Squared reorganized via merger under an LLC with its current name of F-Squared

---

[16] *See id.* ¶¶ 18–19; McClelland Decl., Ex. C (May 8, 2010 Letter).

[17] McClelland Decl. ¶ 20.

[18] *Id.* ¶ 22.

[19] McClelland Decl., Ex. D (June 16, 2010 Letter).

[20] McClelland Decl. ¶ 24.

Investment Management, LLC.[21]  The LLC agreement ("Operating Agreement") provides:

> 5.1 (a) Tax Distributions.  The Members shall be entitled to receive distributions from the Company only at the following times:
>
> (1) With respect to any taxable year prior to the year in which the Company liquidates or sells all or substantially all of its assets, the Company will use reasonable efforts to distribute to each Member on an annual basis, and, in the discretion of the Management Board, quarterly, an amount of cash (calculated in accordance with the terms of this section 5.1 (a)) that is sufficient to cause each Member to have received under this Section 5.1 (a) with respect to such year aggregate distributions equal to the product of the Tax Rate multiplied by the federal taxable income allocated to such Member for such year (such distribution the "tax distributions").[22]

McClelland would not have voted in favor of the conversion if not for the Tax Distribution assurance provided in the Operating Agreement, and as a major shareholder, the conversion would not have been approved without his vote.[23]  McClelland states that it would be impossible to procure investors for a business like F-Squared if they risked not only their initial investment, but also the incurrence of tax liabilities without the means to pay them.[24]

## B.  The Transfers

Once F-Squared became profitable, its board authorized Chief Financial Officer Deborah Deskavich to begin the Tax Distributions.[25]  In the Complaints, Trustee identified six such Tax Distributions made to Defendants between August 29, 2013, and September 8, 2014.[26]  The Tax Distributions were paid on a quarterly basis, in amounts commensurate

---

[21] McClelland Decl. ¶ 25; McClelland Decl., Ex. F (Shareholder Resolutions).

[22] McClelland Decl., Ex. E (Operating Agreement).

[23] McClelland Decl. ¶ 26.

[24] *Id.* ¶ 27.

[25] *Id.* ¶ 28.

[26] With the exception of the complaint against George McClelland, which alleges seven Tax Distributions.  *See supra* note 4.

with the estimated passed-through tax on F-Squared's profits.[27]  As such, for periods during

which F-Squared did not profit—and thus did not incur any tax liability to pass through—it

did not issue Tax Distributions.[28]

## III.    DISCUSSION

### A.  Summary Judgment Standard

A court must grant a motion for summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."[29]  To do so, a movant may rely on material in the record, including

depositions, documents, electronically stored information, affidavits or declarations,

stipulations, admissions and interrogatory answers.[30]  The court does not weigh evidence

and determine the truth of the matter at the summary judgment stage.  Rather, the court

determines whether there is a genuine dispute of material fact.[31]  A material fact is one

---

[27] Along with the Tax Distributions, F-Squared sent letters explaining how they were calculated:

> [T]his distribution is based on 110% of the 2013 tax liability divided by one-fourth.  The total tax rate used in this calculation was 51.65% representing the 2013 maximum federal tax rate of 39.60%, state of Massachusetts rate of 5.25%, additional state rate of 3%, and net investment income tax of 3.80%.  To calculate the amount of this distribution for federal and state, weight the payment 84% for federal, 10.20% for state of Massachusetts and 5.80% for other states, if applicable.

> The additional 3% state tax distribution is a result of F-Squared's understanding that we have investors who live outside of Massachusetts and as a result have higher state tax.

McClelland Decl., Ex. G (Tax Distribution Letters).

[28] *See* McClelland Decl. ¶ 30 ("In the latter part of tax year 2014, when it is my understanding from management that [F-Squared] had no taxable profit due to its deduction of the $30 million disgorgement penalty it paid to the Securities and Exchange Commission . . . I did not receive a Tax Distribution.").

[29] Fed. R. Civ. P. 56(a) (applicable to adversary proceedings by Fed. R. Bankr. P. 7056).

[30] Fed. R. Civ. P. 56(c).

[31] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

which could alter the outcome of the case.[32]  A dispute is genuine where "reasonable minds could disagree on the result."[33]  If the moving party shows that there is an absence of evidence supporting the nonmoving party's case, the burden of proof shifts to the nonmovant, who must offer "definite, competent evidence to rebut the motion."[34]  It is not sufficient for the nonmoving party to merely reassert factually unsupported allegations from the pleadings.[35]  "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment . . . if the movant is entitled to it."[36]  Where the nonmovant fails to provide evidence as to an essential element of its claim, summary judgment must be entered in favor of the movant.[37]

In support of the Motions, Defendants submitted the McClelland Declaration together with eight exhibits.  In opposing the Motions, Trustee submits no evidence whatsoever, much less evidence showing a genuine dispute of material fact; instead, he simply cites to allegations in his Proposed Amended Complaint against George McClelland.[38]  Trustee attempts to discredit the McClelland Declaration—and subsequently, the narrative it provides—by describing it as "self-serving."[39]  I do not doubt that it is self-

---

[32] *Anderson*, 477 U.S. at 248.

[33] *U.S. Wireless Corp. Inc.*, 386 B.R. at 560 (citing *Argus Mgmt. Group*, 327 B.R. at 210).

[34] *Miller v. Kirkland & Ellis LLP (In re IH 1, Inc.)*, No. 09-10982 (LSS), 2016 WL 6394296, at *8 (Bankr. D. Del. Sept. 28, 2016) (citing *Delta Mills, Inc. v. GMAC Commercial Fin. LLC. (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009)).

[35] *Miller*, 2016 WL 6394296, at *8.

[36] Fed. R. Civ. P. 56(e).

[37] *Miller*, 2016 WL 6394296, at *8.

[38] *See generally* Answering Brief.

[39] *Id.* ¶ 34.

serving; it is difficult to imagine circumstances under which a litigant would submit a
declaration that is *not* self-serving.

Trustee challenges four specific assertions Defendants make in the Opening Brief:

    i.      "the vote to convert would not have succeeded absent the Company's representation it would distribute funds sufficient to pay the pass through tax;"

    ii.     "the LLC agreement, in the undisputed circumstances of this case, created a liability on F2's part to pay the Tax Distributions—a liability that was extinguished once those Tax Distributions were made;"

    iii.    "F2 made, and the unit holders received, the Tax Distributions in good faith;"

    iv.    "the general unsecured creditors would have been in roughly the same position had the Company remained as a C-Corp paying taxes as it was with F2 providing the unit holders the means to pay the tax on F2's profit."[40]

Trustee describes these as "plainly disputed material facts," and subsequently laments that
they have not been "tested" via deposition such that I can accept them. But, to borrow
Trustee's parlance, simply stating *ipse dixit* that a fact is disputed does not make it so.[41]
More importantly, Trustee did not invoke Rule 56(d).[42] I will not afford Trustee the

---

[40] *Id.* ¶ 33.

[41] *Id.*

[42] To the extent that Trustee is allowed to forestall summary judgment because he has not yet deposed George McClelland or otherwise "tested" Defendants' evidence, he has failed to do so. The Federal Rules of Civil Procedure specify what a nonmovant must do in such a scenario:

> WHEN FACTS ARE UNAVAILABLE TO THE NONMOVANT. If a nonmovant *shows by affidavit or declaration* that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
>     (1) defer considering the motion or deny it;
>
>     (2) allow time to obtain affidavits or declarations or to take discovery; or
>
>     (3) issue any other appropriate order.Fed. R. Civ. P. 56(d) (emphasis added).

Fed. R. Civ. P. 56(d).

protection of Rule 56(d) without the rule being specifically invoked and its procedural requirements observed.  McClelland is a percipient witness who filed a declaration and exhibits corroborating his statements therein.  To the extent his statements and the exhibits are facts, I have accepted them.  To the extent the statements are legal conclusions, I will treat them as such and dispose of them accordingly.

## B.  The Parties' Positions

Defendants argue that the uncontroverted record here establishes that F-Squared received reasonably equivalent value for the Tax Distributions.  Their principal contention is that the Tax Distributions were mandatory under the Operating Agreement, and that F-Squared discharged a contractual obligation by making the Tax Distributions.[43]  Defendants also argue that creditors are no worse off as a result of the Tax Distributions, because the Tax Distributions were offset by the corporate tax F-Squared avoided by converting to an LLC, and the LLC conversion only came about because the shareholders were promised the Tax Distributions.[44]

Trustee argues that the Operating Agreement only required F-Squared management to "use reasonable efforts" to make the Tax Distributions, and characterizes that language as "plainly not mandatory" and "simply permissive and discretionary."[45]  At oral argument, Trustee moved away from that characterization, instead contending that it was unreasonable under the circumstances for F-Squared to make the Tax Distributions, and thus in excess of the obligations created by the Operating Agreement.[46]  Trustee also

---

[43] Opening Brief 18.

[44] *Id.* at 15.

[45] Answering Brief 9–10.

[46] *See, e.g.,* Transcript 39:6–14.

contends that, as a matter of law, even apparently mandatory tax distributions cannot amount to an antecedent obligation.[47]

### C. The Tax Distributions Were Made for Reasonably Equivalent Value

The Bankruptcy Code authorizes the avoidance of transfers of interests in the debtor's property occurring within two years prior to the petition date as fraudulent conveyances if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred . . ."[48] The trustee bears the burden of proving, by a preponderance of the evidence, that the debtor did not receive reasonably equivalent value for the transfer.[49]

#### 1. The Shareholders' Vote to Permit Conversion of F-Squared from a C-Corp to an LLC Conferred Reasonably Equivalent Value for the Tax Distributions

The law of fraudulent conveyances is intended to remedy unfair transactions. The law "allows creditors to avoid transactions which unfairly or improperly deplete a debtor's assets or that unfairly or improperly dilute the claims against those assets."[50] The unfairness comes in two varieties: (i) where a debtor intends to hinder, delay or defraud its creditors; and (ii) where an insolvent debtor transfers property without receiving reasonably equivalent value.[51] Here, Trustee alleges the latter.

---

[47] Answering Brief 9–11.

[48] 11 U.S.C. § 548(a)(1)(B)(i), (ii)(I). The relevant state law fraudulent transfer statutes are materially identical to that of the Bankruptcy Code. *See* 6 Del. Code §§ 1304(a)(2); Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 6. The parties did not distinguish between the federal and state law for purposes of the Motions. Accordingly, I will not either.

[49] *See Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003).

[50] 5 Collier on Bankruptcy ¶ 548.01 (16th 2021).

[51] *Id.*

The Bankruptcy Code does not define reasonably equivalent value.   The Third Circuit has determined that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"[52] Put differently, a transfer is not fraudulent if creditors are "no worse off" as a result of the challenged transactions.[53] This is a "common sense" inquiry that requires a court to analyze the totality of the circumstances[54] and "does not demand a precise dollar-for-dollar exchange."[55]

F-Squared's payments of the Tax Distributions to Defendants did not make F-Squared (or its creditors) worse off.  As the undisputed facts show, F-Squared induced Defendants to vote in favor of the LLC conversion by promising that F-Squared would make them whole for any tax obligations that passed-through.  Had Defendants not voted to permit F-Squared to convert from an C-Corp to an LLC, F-Squared would have had to pay income tax on its revenue.  F-Squared would have paid its tax obligations directly to the United States Treasury rather than make the Tax Distributions to Defendants, but payment would have been made nonetheless.  In these circumstances, it cannot be said that F-Squared's creditors are worse off.

---

[52] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (quoting *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006)).

[53] *In re EBC I, Inc.*, 382 F. App'x 135, 137 (3d Cir. 2010) (finding no fraudulent transfer where creditors were made "no worse off"); *In re Northlake Foods, Inc.*, 483 B.R. 247, 252 (M.D. Fla. 2012), *aff'd*, 715 F.3d 1251 (11th Cir. 2013) (quoting *In re Stewart Fin. Co.*, No. 03-30277, 2007 WL 1704423, at *4 (Bankr. M.D. Ga. June 8, 2007)) ("[A]s long as "the debtor's unsecured creditors are not worse off because the debtor . . . has received something reasonably equivalent to what the debtor has transferred, then no fraudulent transfer or conveyance has occurred.'"); *In re Kenrob Info. Tech. Sols., Inc.*, 474 B.R. 799, 802 (Bankr. E.D. Va. 2012) (quoting *In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d 479, 484 (4th Cir. 1992)) ("'[A]s long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.'").

[54] *Peltz*, 279 B.R. at 736.

[55] *See In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007)

The facts here are analogous to those in *Northlake*[56] and *Kenrob*,[57] where the

respective courts found reasonably equivalent value for tax distributions because the debtor

elected into a pass-through tax status. Northlake Foods, Inc. was a C-Corp. In 1991, a

shareholder of Northlake executed a shareholder agreement providing that if Northlake's

income ever became taxable to the shareholder rather than to Northlake, Northlake would

pay the shareholder a dividend sufficient to permit the shareholder to pay his taxes.

Northlake subsequently designated itself an S corporation ("S-Corp") on its 2005 federal

income tax return, causing its income tax to pass through to its shareholders. In 2006,

Northlake paid the shareholder a dividend in the amount of tax the shareholder was

required to pay on Northlake's taxable income because of Northlake's election of S-Corp

status. On a suit to avoid the payment as a fraudulent transfer, the bankruptcy court granted

shareholder's motion for judgment on the pleadings[58] and both the district court and circuit

court affirmed. The district court noted that Northlake was not worse off as a result of the

transfers, because it avoided corporate-level tax through the S-Corp election,[59] and the Court

of Appeals for the Eleventh Circuit agreed and also found other benefits to Northlake to be

evident—the shareholder agreement benefitted Northlake because it gave it the flexibility to

---

[56] *See Northlake*, 715 F.3d at 1256.

[57] *Kenrob*, 474 B.R. at 802 (finding reasonably equivalent value for tax distributions because debtor avoided corporate-level tax due to the S-Corp pass-through among ancillary benefits such as retention of operating capital).

[58] The bankruptcy court ruled for the shareholder on two grounds: (i) Northlake received reasonably equivalent value for the tax distributions because the shareholder agreed to the S-corp tax pass-through election in exchange; and (ii) the tax distribution constituted the payment of an antecedent debt under the shareholder agreement. *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, Bankr. No. 8:08-BK-14131-CED, Adv. No. 8:10-AP-930-CED (Bankr. M.D. Fla. Feb. 15, 2011), *aff'd*, 483 B.R. 247 (M.D. Fla. 2012), *aff'd*, 715 F.3d 1251 (11th Cir. 2013). The district court and Eleventh Circuit affirmed on the first basis and so did not reach the second. *See Northlake*, 715 F.3d at 1255 n.5.

[59] *Northlake*, 483 B.R. at 252 ("Because the Debtor would have had to pay income taxes itself had it not elected Subchapter S status, the Court cannot say that either it or its creditors were made worse off by the Debtor's reimbursement to its shareholders for their portion of the income taxes paid.").

shift to S-Corp status when it found it advantageous to do so, and gave it more time to address its tax obligations than it otherwise would have.[60]  As here, the Eleventh Circuit recognized that had Northlake not elected to change its tax status, Northlake would have paid its obligation directly to the United States Treasury.[61]

Kenrob Information Technology Solutions, Inc. was also an S-Corp.  After Kenrob filed a chapter 7 bankruptcy case, the chapter 7 trustee sued its shareholders to avoid payments it made to the Internal Revenue Service on behalf of the shareholders' tax liabilities.[62]  The court found that in exchange for permitting (and continuing to permit) a subchapter S election, Kenrob had agreed to pay the tax obligations that flowed through to its shareholders.[63]  In granting summary judgment, the court observed that the trustee put forth no evidence to show that the tax paid by the corporation on behalf of the shareholders was more than it would have been had Kenrob paid taxes as a C-Corp.[64]  The court also found that Kenrob benefitted by not distributing all of its income to its shareholders, which could then be used for corporate purposes.[65]

Trustee relies heavily on *SGK Ventures*, which summarily concludes that a tax distribution is equivalent to a corporate dividend and can never be for reasonably equivalent value.[66]  *SGK* is not persuasive.  It did not involve a conversion from a C-Corp to an LLC or

---

[60] *Northlake*, 715 F.3d at 1256.

[61] *Id.* (describing corporate-level tax liability as "the money that Northlake would have paid to the federal government directly had it not elected to be an S corporation.").

[62] *Kenrob*, 474 B.R. at 801.

[63] *Id.* at 802.

[64] *Id.* at 802-803.

[65] *Kenrob*, 474 B.R. at 802.

[66] *See In re SGK Ventures, LLC*, 521 B.R. 842, 859 (Bankr. N.D. Ill. 2014) ("Assuming that SGK had committed to pay its members enough cash to satisfy their tax liability for a given year, this

a subchapter S election premised on the payment to members/shareholders of funds to pay

any pass-through tax liability, nor did it discuss such a scenario.  And, the scant analysis

provided is conclusory.[67]

As in *Northlake* and *Kenrob*, the Tax Distributions are inextricably linked to the LLC

conversion that spawned them, and under the totality of the circumstances, it is fair to

regard the entire arrangement as a single cohesive transaction that had a net-zero impact on

F-Squared's finances.  As discussed by the *Kenrob* court, "[t]here is no requirement that the

consideration be contemporaneous," and the tax avoidance granted by the conversion

constituted a continuing benefit to F-Squared.[68]  Ignoring the benefit of the tax avoidance

would not return F-Squared's creditors to their rightful position under the fraudulent

conveyance statute; rather, it would provide them a windfall at the expense of the

---

arrangement—even if called a contract—was equivalent to a corporate dividend; fulfilling the commitment would not produce any benefit to SGK.").

[67] Similarly, other cases cited by Trustee did not involve shareholder agreements requiring payment of tax distributions as a condition for the company to elect a corporate form that would result in pass-through taxes. *See Janssen v. Reschke*, No. 17 CV 08625, 2020 WL 1166221, at *6 (N.D. Ill. Mar. 11, 2020), *on reconsideration in part*, No. 17 CV 08625, 2020 WL 6044284 (N.D. Ill. Oct. 13, 2020) ("[The debtor] is an LLC that has always been taxed as a partnership . . . [it] received no benefit from its pass-through tax status because it never had any entity-level tax obligations."); *In re TC Liquidations LLC*, 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011) ("Defendants chose to maintain the "S" Corporation status of the Debtors, which meant that Defendants, as the shareholders, were personally liable for the taxes. It was improper for the Debtors to issue the Tax Dividends and essentially pay Defendants' personal tax obligations. There is no shown consideration provided to the Debtors for these payments."). Finally, *In re DBSI, Inc.*, 561 B.R. 97, 100–01 (D. Idaho 2016), *rev'd in part on other grounds*, 697 F. App'x 493 (9th Cir. 2017) is wholly distinguishable.  Not only was there no operative agreement, but the payment was part of a "widespread and devastating fraudulent scheme" avoided as an actual fraudulent conveyance.  Nonetheless, the *DBSI* court distinguished the facts before it from cases where a debtor was formerly subject to taxes, stating that those debtors "accrued a concrete benefit by electing a different taxable status." *DBSI*, 561 B.R. at 101.

[68] *Kenrob*, 474 B.R. at 803 ("The consideration was the election by the shareholders of the corporation to be taxed as a chapter S corporation as long as the corporation paid their additional personal taxes. There was a continuing benefit to the corporation over the years and a continuing obligation on the part of the corporation to reimburse the shareholders."); *Northlake*, 715 F.3d at 1256 (finding reasonably equivalent value where subchapter S election and tax distribution occurred fourteen years after execution of shareholder agreement).

shareholders who agreed to take on F-Squared's tax liability only if the Tax Distributions were made.

The F-Squared shareholders agreed to take on the pass-through tax liability, which eliminated F-Squared's corporate taxes. By then issuing the Tax Distributions, F-Squared as a corporate entity was simply returned to roughly the same financial position it would have been in had it remained a C-Corp. Trustee offered no evidence that the Tax Distributions were greater than they would have been if F-Squared had remained a C-Corp. Rather, the undisputed evidence shows that F-Squared calculated the burden of its corporate income tax and the prospective Tax Distributions to be roughly equivalent,[69] and that F-Squared calculated the Tax Distributions in accordance with a formula reflecting the shareholders' estimated tax liability.[70] F-Squared only issued Tax Distributions to cover the estimated tax liability (and thus, none when F-Squared had no income), and on one occasion when it accidentally exceeded the estimated tax liability, it specifically recharacterized that excess as a profit distribution.[71] F-Squared thus received "roughly the value it gave,"[72] leaving its creditors no worse off than they would have been had it never converted to an LLC.

## 2. The F-Squared Tax Distributions Were Mandatory

Notwithstanding the above analysis, Trustee contends that the Tax Distributions were not for reasonably equivalent value because the Operating Agreement does not

---

[69] *See* McClelland Decl., Ex. D (June 16, 2010 Letter).

[70] McClelland Decl., Ex. G (Tax Distribution Letters).

[71] McClelland Decl., Ex. H (Excess Distribution Letter) ("No additional tax distribution payment will be remitted to you for 2014. The Company has met the tax liability of its unitholders with tax distributions remitted during the year. In fact, the Company over distributed approximately $0.04 per unit, which will be reclassified as a profit distribution.").

[72] *VFB*, 482 F.3d at 631.

embody a mandatory agreement to make Tax Distributions.  In other words, Trustee

contends that even if Defendants and F-Squared agreed to a quid pro quo for the conversion

to S-Corp status, the governing language in the Operating Agreement is "plainly not

mandatory" and therefore the bargained-for consideration is illusory.  Instead, in the

Answering Brief, Trustee argues that Tax Distributions are discretionary or simply

permissive.[73]  I disagree.

> The Operating Agreement provides:
>
> 5.1 (a) Tax Distributions.  The Members *shall be entitled* to receive distributions
> from the Company only at the following times:
>
> (1) With respect to any taxable year prior to the year in which the Company
> liquidates or sells all or substantially all of its assets, the Company *will use
> reasonable efforts* to distribute to each Member on an annual basis, and, *in the
> discretion* of the Management Board, quarterly, an amount of cash (calculated in
> accordance with the terms of this section 5.1 (a)) that is sufficient to cause each
> Member to have received under this Section 5.1 (a) with respect to such year
> aggregate distributions equal to the product of the Tax Rate multiplied by the
> federal taxable income allocated to such Member for such year (such distribution
> the "tax distributions").[74]

The prefatory language in the above paragraph is mandatory—"shall be entitled."  The

language is not discretionary.[75]  This is confirmed by the use of the word "discretion"

further down in this subsection (1) as well as section 5.1(a)(3) of the Operating Agreement,

which reads, in relevant part, "The Management Board shall determine in good faith the

amount of the Tax Distributions *required by* this Section 5.1(a), and such determination shall

be final and binding."[76]  Moreover, Trustee's reading of the words "shall be entitled" as

discretionary would make unnecessary (or relegate to surplusage) any further discretion

---

[73] Answering Brief ¶ 30.

[74] Operating Agreement 12.

[75] The mandatory language is also directed to Members—not management.

[76] Operating Agreement 12 (emphasis added).

with respect to the actual timing of the Tax Distributions. Nor are the Tax Distributions subject to management's "reasonable efforts." The phrase "reasonable efforts" governs the *timing* of the distributions: "the Company will use *reasonable efforts to distribute* to each Member *on an annual basis* . . . [Tax Distributions]."[77] Once again, Trustee fails to give any meaning to the prefatory language mandating distributions in years in which the company is not liquidating and jumps over it to the timing of the distributions. In sum, Defendants were "entitled to" Tax Distributions for years in which F-Squared was not liquidating, F-Squared was obligated to "use reasonable efforts" to effect Tax Distributions on an annual basis, and F-Squared had discretion to issue Tax Distributions quarterly.

Again relying on the argument that "reasonable efforts" is the controlling language vis-à-vis the Tax Distributions, Trustee next argues that any bargained for exchange became qualified when reduced to writing. In other words, Trustee argues that while Defendants may have bargained for mandatory tax distributions in exchange for their vote on the S-Corp conversion, in the drafting process any mandatory commitment was watered down. He contends that "reasonable efforts" means that F-Squared was only obligated to issue the Tax Distributions if it was reasonable to do so. Assuming, *arguendo*, that "reasonable efforts" is the controlling language, Trustee misinterprets the meaning of "reasonable efforts" in the context of the Operating Agreement.

Under Delaware law "reasonable efforts" has no exact, universal meaning, but must be interpreted in context.[78] Broadly speaking, such clauses mean that the obliging party

---

[77] *Id.*

[78] *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, No. CIV. A. 2742-VCN, 2009 WL 3247992, at *6 (Del. Ch. Oct. 6, 2009), *as revised* (Oct. 6, 2009), *aff'd*, 985 A.2d 391 (Del. 2009) (holding that meaning of "best efforts" is context-specific).

must *try* to bring about the identified outcome, but are short of an absolute requirement that the outcome occur.[79] These clauses "mitigate the rule of strict liability for contractual non-performance that otherwise governs," an acknowledgement that "[a]t times, a party's ability to perform its obligations depends on others or may be hindered by events beyond the party's control."[80] The contracting parties "add an efforts clause to define the level of effort that the party must deploy to attempt to achieve the outcome."[81] But while practitioners may distinguish degrees of efforts clauses based on language (i.e., "best efforts" as a higher standard than "reasonable efforts"), Delaware courts generally do not recognize such distinctions.[82]

In *Williams*, a merger agreement obligated the defendant to use "commercially reasonable efforts" to obtain a favorable opinion from its tax counsel as a condition precedent to completion of a merger.[83] The defendant failed to obtain the opinion, but the Court of Chancery found no breach of the merger agreement because the defendant did not actively obstruct its tax counsel from issuing the opinion. The Delaware Supreme Court reversed, holding that "reasonable efforts" requires more from the obligor than mere non-interference; rather, efforts clauses "impose obligations to take all reasonable steps to solve problems and consummate the transaction," and there was evidence on the record that the

---

[79] *Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, No. CV 2017-0665-KSJM, 2020 WL 4581674, at *22 (Del. Ch. Aug. 10, 2020) ("Language like 'commercially reasonable efforts' does not require the identified outcome. Rather, it requires parties to try to achieve the identified outcome.").

[80] *Akorn, Inc. v. Fresenius Kabi AG*, No. CV 2018-0300-JTL, 2018 WL 4719347, at *86 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018).

[81] *Id.*

[82] *See id.* at *87 (observing little support in case law for distinguishing levels of efforts clauses, and that the Delaware Supreme Court has treated efforts clauses with varying language identically).

[83] *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017).

defendant could have done more to obtain the tax opinion.[84] The merger agreement context may not translate one-to-one with the operating agreement context here, but it is nonetheless clear that "reasonable efforts" amounts to more than discretionary or permissive language. Under Delaware law, "reasonable efforts" creates an affirmative obligation to act.

As applied here, the question is not, as Trustee urges, whether it was unreasonable from a managerial perspective for F-Squared to issue Tax Distributions in light of the unliquidated SEC liability.[85] Rather, the question is whether issuing the Tax Distributions required an unreasonably high *effort* from F-Squared, thus exceeding its obligation under the Operating Agreement. Put differently, the question is whether F-Squared reasonably *could* make the Tax Distributions, not whether it reasonably *should* have made the Tax Distributions. There is no dispute that F-Squared did in fact have the cash on hand that it needed to make the Tax Distributions. Nor is there any evidence that making the Tax Distributions caused F-Squared to incur debt or to default on other commitments, acts which *might* amount to "unreasonable effort" exceeding F-Squared's obligation under the Operating Agreement. Further, F-Squared did not create new problems for itself by distributing its unencumbered cash pursuant to the procedures mandated in the Operating Agreement. The problem that Trustee points to as rendering the Tax Distributions "unreasonable"—the SEC liability—existed in its unliquidated state regardless of the Tax

---

[84] *Id.* at 273–34.

[85] Upon questioning, Trustee agreed that under his interpretation of "reasonable efforts" the central question is whether F-Squared *should* have made the distributions; or in his words "the advisability of whether you should do something." Transcript 48:21–49:10. Arguably, in the absence of an obligation, there is no scenario in which it would have been "advisable" to make the Tax Distributions, as doing so did not offer any business advantage to F-Squared; it would simply be cash out the door. Trustee's interpretation of "reasonable efforts" is therefore nonsensical.

Distributions. Thus, even accepting that "reasonable efforts" controlled F-Squared's obligation to make the Tax Distributions, F-Squared was indeed obligated to make them—i.e., achieve the outcome—based on the record at hand.

### 3. The Creation of Antecedent Debt Through the Operating Agreement

Finally, Defendants separately (but, in parallel) contend that F-Squared's obligation under the Operating Agreement to pay the Tax Distributions (regardless of the bargained for inclusion of the relevant provision) amounted to an antecedent debt and therefore the Tax Distributions were for reasonably equivalent value as a matter of law. The argument is as follows. Under the Bankruptcy Code, "debt" means "liability on a claim,"[86] and "claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[87] The terms "debt" and "claim" are therefore coextensive under the Code.[88] Further, under Delaware law, an LLC agreement is a contract binding on the LLC[89] and "at the time a member becomes entitled to receive a distribution, the member has the status of, and is entitled to all remedies available to, a creditor of a limited liability company with respect to the distribution."[90] Therefore, once an LLC member becomes entitled to a distribution, such unpaid distribution constitutes antecedent debt. This theory

---

[86] 11 U.S.C. § 101(12).

[87] 11 U.S.C. § 101(5).

[88] *In re NewPage Corp.*, 569 B.R. 593, 603 (D. Del. 2017).

[89] *See* Del. Code § 18-101(9) ("A limited liability company is bound by its limited liability company agreement whether or not the limited liability company executes the limited liability company agreement."); *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 287 (Del. 1999) (holding that an LLC agreement "is binding on the LLC as well as the members").

[90] Del. Code Ann. tit. 6, § 18-606

finds footing in *Kenrob*,[91] and in a line of opinions in another of the adversary proceedings in *Northlake*, separate from those cited above.[92] In *McGarrity*, the district court undertook the same analysis described in *NewPage*, drawing the definition of "debt" from the Bankruptcy Code to find that "[a] debtor incurs a debt to a creditor when the creditor has a claim against the debtor, even if the claim is unliquidated, unmatured, unfixed or contingent."[93] The district court found that the shareholder agreement at issue contractually obligated the debtor to make the challenged tax distribution, and thus affirmed the bankruptcy court's ruling that the tax distribution "was paid to satisfy the Debtor's binding obligation to [the shareholder]."[94]

Trustee argues, relying primarily on *SGK*, that even where a tax distribution can be construed as mandatory, it cannot amount to an "antecedent obligation" for the purpose of a reasonably equivalent value analysis.[95] The *SGK* Court ruled that even mandatory tax distributions were "equivalent to a corporate dividend" producing no benefit for the debtor, and thus not for reasonably equivalent value. The *SGK* court provides no authority in support of the notion that a tax distribution is equivalent to a corporate dividend, and only provides by way of explanation that "fulfilling the commitment would not produce any benefit to SGK" and that "SGK received no consideration for the 2008 distribution." In

---

[91]  474 B.R. at 803 ("The agreement between the shareholders and the corporation was valuable consideration to the corporation where the tax payments on behalf of the shareholders represented no more than the pass-through tax liability.  The payment of the associated tax liability does not constitute a constructively fraudulent transaction.").

[92]  *Crumpton v. McGarrity (In re Northlake foods, Inc.)*, No. 8:11-CV-2649-T-17, 2012 WL 4466527, at *4 (M.D. Fla. Sept. 27, 2012), *aff'd sub nom. In re Northlake Foods, Inc.*, 518 F. App'x 604 (11th Cir. 2013).

[93]  *McGarrity*, 2012 WL 4466527, at *4.

[94]  *Id.* at *5.

[95]  Answering Brief 10.

rejecting *Kenrob* and *Northlake*, *SGK* does not address the above analysis, and simply describes those cases as "not well grounded."[96]

I hesitate to adopt a categorical rule regarding whether any type of mandatory distribution—and in particular a pure profits distribution—could be a payment on an antecedent debt. And, I need not resolve that here. In the context of this case, where F-Squared agreed that it would make distributions on passed-through taxes as a condition to gaining acceptance from a group of shareholders for conversion to an S-Corp, I find that shareholders provided reasonably equivalent value.

**CONCLUSION**

For the reasons set forth above, Defendants' motions for partial summary judgment are granted. The parties are directed to submit an order, tailored as appropriate, for each adversary proceeding.

Dated: August 10, 2021

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[96] *SGK*, 521 B.R. at 859 (citing *Northlake*, 483 B.R. at 253; *Kenrob*, 474 B.R. at 802).